Good morning. May it please the Court, Ryan Moore, on behalf of the Appellant, Mr. Ortega. I'll reserve two minutes. I'll watch the clock. I'll address Mr. Ortega's claim this morning that he satisfied the prejudice prong of his collateral attack on his prior removal order in his reentry case, first, because the agency lacked authority to conduct the removal proceedings in his case, and second, because the relief of voluntary departure was plausible 17 years ago. After Pereira, the statute defines, Section 1229, in one place and in one provision alone, the substantive requirements for what is the charging document to initiate removal proceedings. We know that the regulations provide that the NTA, the notice to appear, confers jurisdiction on an I.J. But that regulation is based in a statute. It's based at the statute doesn't address the jury. Jurisdiction is a strange word for this to begin with. It is. So that seems to me to be something you need to cope with. But in any event, the statute doesn't say anything about when the immigration court begins to have authority to proceed. So there are two questions there. The regulation used the word jurisdiction, which is why we've used it. But jurisdiction is for courts, and here we're talking about agencies. And when agencies act beyond their authority, they act as ultra vires. So the issue with respect to the statute is that the statute doesn't talk about this. So why can't the agency just in its regulations explain how you start a proceeding and happen to use a word that's in the statute also, but use it differently? Well, it could. But this regulation is based in this statute. The statute doesn't need to use magic words. What it needs to do is reflect Congress's intent to require, for all purposes, including immigration court jurisdiction or power to hear the case, that the hearing date be included. And so the statute doesn't do that. But Congress didn't do the second. That's the problem. I'm sorry? Congress did not do the second. It didn't address in any fashion, as I understand it, when the authority to proceed, if we're going to call it that, vests in the immigration court. Is that correct? Judge, we argue that it does using the normal tools of construction, the text, the surrounding provisions, the legislative history. So where does it speak to when a proceeding can start in the statute? Well, the title of the statute begins, Initiation of Removal Proceedings. But, okay, what about the body of the statute? The text of the statute uses the term, Notice to Appear, which we know is the charging document. All the justices in Pereira agreed, or at least didn't dispute, that it's the charging document, and we know that from our case law. And it required that the – it listed the requirements for Notice to Appear as substantive. They have to be there. The surrounding provisions, the other subsections below subsection A-1, address other initial matters for an immigration court, like when the initial hearing can't be scheduled after initial notice has been provided, that a change in the hearing time should be provided. And then Congress affirmatively added this provision in 1996. And so what we have is Congress in a statute talking about the initiation of removal proceedings, describing what is the charging document, and Pereira telling us that those requirements are substantive. If the regulation that the government relies on, the regulations that provide that a notice to appear that omits hearing date information can suffice to give an immigration court jurisdiction, if that regulation  rule is read out of the statute because of the statute. Kagan. I don't understand that point at all. I mean, I know you made it, and it doesn't make sense to me. I mean, the stop-time rule is in the statute. The Pereira has said what it means. It has to do with timeliness, and it says that you don't count – it has – from when should you count the time. But what does that have to do with reading it out of the statute? The stop-time rule is in the statute, and it has to have meaning and effect. And that is why these regulations – Kagan. It did in Pereira, didn't it? Pereira. I mean, Pereira – no one's trying to overrule Pereira, as I understand it. No. And the argument is, is that if a notice to appear that lacks a hearing date suffices to start a removal proceeding, in that proceeding, the stop-time rule – Well, it doesn't, in fact, start a removal proceeding because without a date for a hearing – in other words, as I understand it, what starts the removal proceeding is the notice to appear under the regs. It's a notice to appear plus a second notice as to when the hearing's going to be. And you put the two together, and now the immigration court can proceed. It can't proceed without the second. But in that case, the stop-time rule is never going to apply in that case because Pereira was crystal clear that to trigger the stop-time rule, the notice to appear had to have included the hearing date. Okay. So that's why the regulation is inconsistent with Pereira's holding about the stop-time rule. Regulation isn't trying to tell you anything about the stop-time rule. It's trying to tell you when the court can go forward. Right. But if the court can go forward in those cases – But it can't go forward until you have both the notice to appear and the notice of hearing. Well, that's true. But down the road in that case, if the government would like to invoke the stop-time rule in that case, it won't be able to because there was never a notice to appear filed. Well, that's the government's problem, then. I mean, so that's a problem if there's a stop-time problem, but not if there's not. Right? Well, it – that helps tell us what Congress intended in Section 1229. It wouldn't have intended that this two-step notice process, incomplete notice to appear and a later hearing notice, can trigger IJ jurisdiction if that would mean that another one of the provisions that it wrote into the law is not going to exist. It's not going to have any effect. Well, you haven't explained why it's not going to exist. But let me – let me step back a minute. Okay. Things are moving very fast in this area, and there's now a BIA opinion. This case strikes me as a particularly bad one in which to decide this issue, which is, you know, filtering up all over the place because it's not coming up through the agency. Does that make any difference in terms of our obligation to defer to the agency's construction? Judge, we don't believe that Chevron deference is appropriate ever in a criminal case. Well, that's the problem, though. So it's a very odd situation here because we're – I don't know whether that's true, but I, you know, I at least make sure it's a little uneasy. So for – to be deciding, you know, this nationally critical issue in a slightly oddball case gives me pause in any – either direction. Right. We urge the Court to decide the issue without regard to Chevron deference. Therefore, I would like you to get to the other issue. I'm sorry? I would therefore like you to get to the other question in the case. Thank you, Judge. And if we would ask the Court at least to remand on the Pereira issue to allow us to explore in the district court since it was – it is properly before the Court at this time. Do you – one question as to getting to the second question. I mean, do you agree at least to the point that this isn't really jurisdiction in the sense that we could get to the second issue? To the second issue? Could we skip the first issue and get to the second issue because it's not really jurisdictional in the strict sense? It's certainly not the district court jurisdiction, but is it – is it anything that would stop us from getting to the – to the Pereira's question? It's not something that would stop you, but if you – if you don't resolve the prejudice question in our favor, we shouldn't be – I understand that, but I want to know if we can – you're going to run out of time, but I would like you to take two or three minutes anyway to discuss the prejudice question. Your Honor, Ms. Kagan – Including whether we can reach it on your theory of Pereira. You can reach the issue. The Pereira question is a question of whether the I.J. had statutory authority to do what he did, not whether there's jurisdiction in the sense that courts – I just want to make sure we're on the same ground there. Go ahead, then. Ortega's case does fall within the broad spectrum of cases in which voluntary departure is merely plausible. There are two favorable legal standards at play, the plausible ground standard, which is lenient and we know the standard, and then the standard for pre-conclusion voluntary departure, which is the – the – the most readily available relief and removal proceedings. And I.J.'s have broader discretion to grant that than anything else. And so based on the factors, Ortega's 23 years in this country, his two citizen kids, his work history, all provides a powerful humanitarian reason and a reason within the BIA's construction and factors of this form of relief to outweigh – The question I have about this is that it strikes me as kind of weird to be – with regard to voluntary departure, I'm not even sure what the standards are. Because, as you point out, with this kind of voluntary departure, there's no good moral character or whatever, and, moreover, I mean, if he's leaving anyway, why are we worrying so much about his history? The notion is because he's going to come back or because he's going to have less sanctions in coming back, is that why? Judge, the only answer I have for that is that those are the factors that we have to work with, that the BIA has given us. And it may be that those are entitled to less weight, and the Court can assign less weight to those, because this isn't a substantive form of relief that is going to result in him being able to stay. But it is a very broad form of relief. It's really not much in terms of relief at all. And it's so minimal that – But the consequence of it, I guess, is that he doesn't have a removal and, therefore, can't be, for example, prosecuted for returning after a removal? And he doesn't – and he can't be reinstated because he doesn't have a removal? A voluntary departure order avoids exposure to a 1326 charge, and it also avoids a grounds of inadmissibility for having a removal order, which is a 10-year bar. But in most of these cases, the 10-year bar is already going to be in place under a separate grounds of inadmissibility for a prior period of unlawful presence. So really, in a case like this, it only avoids reentry exposure. And is the question an objective one as opposed to a subjective one about what this particular I.J. would have done? None of this Court's cases has ever engaged in a subjective analysis, tried to ascertain what the I.J.'s predilections were, or required that the I.J.'s come and testify in each of these cases. So it is subjective. And one of the reasons – another reason is because it's not a probability requirement. I mean, we don't have to show it. What is the consequence for this case? It's that he can't be prosecuted for reentry? That would be it. The underlying civil removal order would still remain in place. And this Court has made that clear in one of its decisions, that all you would be doing, if you were to rule that this removal order would be the – And was this his only removal order? Well, he had subsequent reinstatement orders, which don't need to be – Right. But they wouldn't pop back in again because there wouldn't be an underlying removal order. Exactly. So this is the only underlying removal order for any of those reinstatements. And so he – Okay. Thank you very much. We'll give you a minute in rebuttal. Good morning, and may it please the Court. My name is Kevin Hakala, and I represent the United States in this proceeding here this morning. Your Honors, this case was remanded back to the district court to address a single issue, and that is whether, in light of the defendant's extensive criminal history, he was prejudiced by the defects in his underlying removal proceedings back in 2001. And if he was not prejudiced, then the Court should uphold his conviction and the sentence in this case. Now, the defendant has the burden in this case. He has to show that his positive equities outweigh his negative equities, and that it is plausible that an immigration judge would have granted involuntary departure. Is your point as to the first – did you start – you did because you're – you're arguing that the Pereira issue isn't properly before us, at least if it's not a jurisdictional question, which he now agrees it isn't? Correct, Your Honor. Yes. Well, do you think it's not properly before us, or do you think it's just not a problem? It's both. It's definitely not properly before the Court, because there are factual issues that would have – need to have been resolved by the district court, and it should have been briefed well before it actually got up to your honors, but – What are the factual issues? Whether the date was included in the – in the notice to appear? Not – not just the – not just what was in the notice to appear. I mean, we do have a copy of the notice to appear in the excerpts of the record, but also whether – any subsequent notices that he received, the circumstances under which he received them, and – But on – on their theory, none of that matters, right? It has to be in the original NTA? Under the defense theory, right, there's basically no jurisdiction if there are defects in the NTA such that the date and time are not in there. But that is far removed from the issues that the Supreme Court dealt with in Pereira, which was the stop-time rule involving an immigrant who had been ordered removed in absentia who never got notice of the – the actual time and date of the hearing. That's not the circumstances that we're dealing with here, so I don't think that the Court needs to – if the Court wants to take up the Pereira issue – I'm sorry, Your Honor. No, go ahead. If the Court wants to address the Pereira issue, then I think it should be remanded, but the government's position is that Pereira is not relevant to this proceeding at all. The issue is – So, I mean, one option would be to address Pereira and agree with you on that, right? I mean, maybe we shouldn't, but that's one option. So we would only remand sort of on their theory of the Pereira issue, right? Or some in-between theory, I guess, of what it means. Well, depending on which theory – at the very least, they're asking that you remand. They're asking that – in the alternative that you remand, but primarily they're asking that you find that there was no jurisdiction to be given. Right. It would be sort of an in-between theory. Like, you say it doesn't matter at all. He says it can't be fixed. There would be some in-between that would require a remand, I think. Yes, Your Honor. But what I was trying to clarify is, all right, are you taking the position that because they didn't raise it in the first place and they came up here and we remanded for a specific reason, that essentially that's the mandate in the case, and this issue, Pereira issue, could have been raised before. I mean, of course – I mean, it was certainly a lot more likely to be raised after the Supreme Court case, but theoretically they could have dreamed this up themselves. Yes. And either on a rule of mandate point or something like it, we just don't have that issue in this case, period. I'm not sure – Because it wasn't raised when it should have been raised, and either in the district court or here the first time. And when it was sent back, it was sent back for a specific reason, and that's the only thing the district court was supposed to do or could have done, and the rest of it is spinach, essentially. Yes. And if they were going to raise it, they should have done it at the district court level. They didn't need the Pereira decision to make these arguments. But even if the government's position is that it just doesn't apply, what Pereira dealt with was a very isolated set of circumstances. Well, that may be, but it dealt with it in a plain-words manner, which seemed to say, you know, here's the statute, this is what it says, if it's not this, it's not an NTA, period, the end. And in order for you to prevail, as I understand it, you need – we need to accept the fact that the regulations can say something different about the same words in a different context. Correct. You would need to – in order to go forward without remanding the case, you would have to accept the government's position that there was no lack of jurisdiction by any of the possible defects. Well, I know, but you're not engaging with the question of – I mean, to say that Pereira was a limited issue is true, but you also have to deal with what the opinion says to get to that issue. And what it says to get to that issue seems to be – and Congress said what a notice to appear is, it's supposed to have the date and time. If it doesn't have the date and time, it's not a notice to appear. Correct. And that was done within the context of the stop-time rule. But the – and there's – there was nothing at all to indicate that had the subsequent notice of hearing that was sent to Pereira, had he actually received that, it likely would have had a completely different outcome. But because we're not dealing with the stop-time rule in this case, any of the deficiencies in the NTA – Are you arguing that we should defer to the recent BIA case, or should we defer to the recent BIA case? Yes, Your Honor. As noted in our – the 28-J letter, the issue from the agency's perspective has been resolved. The – But you don't specifically argue for Chevron deference, as I understand it. No. And I don't think the Court's required to even give Chevron deference. I think that the – what the regulations do specify, that as long as there's a charging document that's filed and if there's a subsequent notification that contains the necessary date and time, then that's sufficient. The agency does that. The immigration judge has jurisdiction in that set of circumstances, which is what we had here with Mr. Ortega. Do you want to address the prejudice question? I'm sorry, Your Honor. You want to address the prejudice question. Yes, Your Honor, I would like to. Again, I mean, that is the issue that was remanded back to the district court. It was briefed thoroughly with the district court. There was a lengthy motions hearing, and the district court ultimately found in light of its extensive criminal history that it is not plausible that the defendant would have been granted a voluntary departure. And that's the same argument that we make here with – before Your Honors. The case that we feel is most on point is the Valdes-Navoa case, and the case that the defense has relied almost entirely on is the Alcazar-Bustos case. Alcazar-Bustos was an unpublished case involving an individual who was brought to this country when he was two months old, and he basically lived here his entire life. Weren't the convictions in Valdes-Navoa much more serious? The convictions themselves were more serious. However, when the courts have instructed, when you're conducting the plausibility analysis, you have to look to cases that are – where the defendant is most similarly situated. No two cases are going to be exactly alike, but the entire library of cases that just address prejudice, Valdes-Navoa is most on point. He was – the court specifically found that because of the increasing severity in the behavior leading up to the removal proceedings, that that was a significant factor. And they also relied heavily on the information in the PSR in terms of the underlying conduct which served the basis for his criminal convictions. We have very similar conduct in this case. Do you agree that it's an objective question rather than a subjective question? Yes, it is. And so does it matter whether things we look at are unpublished or published? Because aren't we just sort of looking at what courts did in general, and it doesn't really matter whether they're published or unpublished? The mere fact that they're unpublished, I don't think that's what's the most significant. I think it's the level of analysis that you get in those cases, and I think you'll find that the — But ultimately, the question is predictive, right? I'm sorry? It's predictive. Yes. So looking at unpublished — I mean, the most relevant data would seem to be BIA and IJ opinions, but the problem is the same problem we always have with these, which is that they don't exist except if there's an appeal, so you can't really find out what happens. Correct. What about the Gonzales-Figueroa case in the BIA, which approved a grant of voluntary departure for somebody who had four convictions for assault, six months in prison, both more serious and more than this guy had, and numerous arrests, and they said it was okay to give him — apparently the IJ granted him voluntary departure and they approved it. I think in that case, while it was not an abuse of discretion on the IJ's part, that case is — But that's the question here, isn't it? It's quite — plausibility at least would mean if the IJ could have granted it and not abused his discretion. Isn't that essentially the standard? The standard is not whether a single IJ would have granted it, because that just shows that it's a mere possibility. We have to show that it's more than a mere possibility. We have to show that it was plausible. Even if an IJ could have granted it and not abused his discretion, that's not good enough? That is not good enough, Your Honor. Really? And I see that I am out of time. That's all right. Go ahead. Do you have any authority for that proposition? I'm sorry, Your Honor. Do you have any authority for that understanding of what plausible means, as opposed to an IJ — if an IJ would have granted it, it would not have been an abuse of discretion? In the Valdez-Navoa case, Your Honor, there is language in there where the court specifically says that the mere existence of a case where an IJ would have done — granted the voluntary departure — But — and not abused his discretion in doing so. Correct. That's — I mean, that's an agenda that you're leaving out. But I do think at the end of the day, Your Honor, when we have a defendant like Mr. Ortega, who committed all of his misconduct after he was 30 years old, the majority of it after he was 38 years old, much of it against his own family members, his wife, some very, very serious information condated in the PSR about the way that he physically basically assaulted her. I think when you have that in the context of occurring within, you know, months of the actual removal hearing, seven — I mean, he obtained seven convictions in the four years leading up to the removal proceedings. I think those are the factors that the court found significant also in Valdez-Navoa because it was the increasing severity of the criminal misconduct. And Alcazar-Bustos, which involved a teenager, and he was a teen when he committed all of his misconduct, I said, that is not a defendant that's similarly situated. Valdez-Navoa is similarly situated. And so we would ask that the court affirm the sentence. Are you using just the not merely conceivable language in Valdez-Navoa to get to this, or is there some other quote in Valdez-Navoa that sets out the standard? If I have a moment, I have the citation right here. It's the language where they — the court says, we expressly reject the contention that relief is plausible whenever an I.J. could have granted the relief at issue. As Your Honor pointed out, without abusing discretion. Such a standard is akin to showing a mere possibility or conceivability, which we have plainly held as insufficient to satisfy the prejudice prompt. I think by relying on the Alcazar-Bustos case, which again involved a juvenile who'd lived here his entire life, and all of the convictions that he earned while he was a teenager, that is the wrong case for identifying somebody who is similarly situated. That's what we — you have to do that. You have to find a defendant similarly situated. And the closest we have is Valdez-Navoa. Okay. Thank you very much. Thank you for your argument. We'll give you one minute of rebuttal. Thank you. Thank you, Your Honor. Mr. Ortega has no assault convictions. He has no domestic violence assault convictions. He has three convictions for violating no-contact orders. We provided the statutes of convictions in those cases. They don't require assault. They don't require abuse. They require unpermitted contact alone. Judge, the Alcazar-Bustos case that we've relied on, in combination with other cases, the alien in that case was young. He was 21 years old. But this isn't just a sentencing where youth mitigates punishment or culpability. One of the additional factors for voluntary departure is the desirability of the applicant for admission at some future point in time. And the alien in that case had — was an armed felon gang member with two prison sentences for about three years who hadn't helped his family much and had, at age 21, recidivated with regard to weapons. He was less desirable than Mr. Ortega, who had children, no gun involvement, no gang involvement, and who had never been to prison. Okay. Thank you very much. Thank you both for your arguments. The case of United States v. Ortega is submitted. We will go to United States v. Chonorio.
judges: Berzon, Friedland, Cardone